FILED

2024 Sep-18  AM 10:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| CHRISTINA ANN REESE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cv-00181-SGC |
| | ) | |
| COMMISSIONER, SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

The plaintiff, Christina Ann Reese, appeals from the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for supplemental security income ("SSI").  (Doc. 1).[2]  Reese timely pursued and exhausted her administrative remedies, and the Commissioner's decision is ripe for review pursuant to 42 U.S.C. § 405(g).  As explained below, the Commissioner's decision is due to be affirmed.

## I.    Background and Procedural History

Reese has a limited education—having completed the seventh grade—and has

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 15).

[2] Citations to the record in this case refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear as: Doc. __ at __.  Citations to the administrative record (Doc. 13) refer to the page numbers assigned by the Commissioner and appear as: R.__.

worked as a cleaner and home attendant.  (R. 38, 79).  Reese's October 27, 2020 SSI application alleged disability beginning on February 13, 2007, due to high blood pressure, irregular heartbeat, diabetes, carpal tunnel syndrome ("CTS"), tendonitis of the feet and legs, back problems, and migraines.  (R. 231, 264).  Reese was 46 at the time of her application.  (*See* R. 231).  After her claim was denied initially and on reconsideration, Reese requested a hearing before an Administrative Law Judge ("ALJ").  (*See* R. 26).  Following the hearing, the ALJ issued an unfavorable decision on March 28, 2022.  (R. 26-40, 74-96).

Reese requested review of the ALJ's decision, which the Appeals Council denied.  (*See* R. 1-4).  The decision then became the final decision of the Commissioner. *See Frye v. Massanari*, 209 F. Supp. 2d 1246, 1251 (N.D. Ala. 2001) (citing *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998)).  Reese thereafter commenced this action.

## II.     Statutory and Regulatory Framework, and the ALJ's Decision

To establish eligibility for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).  An SSI applicant must demonstrate disability while the application for

benefits is pendings. *Moore v. Barnhart*, 405 F.3d 1209, 1211 (11th Cir. 2005). The Social Security Administration ("SSA") employs a five-step sequential analysis to determine an individual's eligibility for benefits. 20 C.F.R. § 404.1520(a)(4).

First, the Commissioner must determine whether the claimant is engaged in "substantial gainful activity." *Id.* at § 404.1520(a)(4)(i). If the claimant is engaged in substantial gainful activity, the Commissioner will find the claimant is not disabled. *Id.* at § 404.1520(a)(4)(i) and (b). At the first step, the ALJ determined Reese had not engaged in substantial gainful activity since October 27, 2020, the date of her application. (R. 28).[3]

If the claimant is not engaged in substantial gainful activity, the Commissioner must next determine whether the claimant suffers from a severe physical or mental impairment or combination of impairments that has lasted or is expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant does not have a severe impairment or combination of impairments, the Commissioner will find the claimant is not disabled. *Id.* at § 404.1520(a)(4)(ii) and (c). At the second step, the ALJ determined Reese has the severe impairments of obesity, depression, anxiety disorder, CTS, migraines, and chronic obstructive pulmonary disorder. (R. 28).

---

[3] While Reese's application alleged disability beginning in 2007, SSI benefits are unavailable for any month prior to the application. *See* 20 CFR § 416.335.

If the claimant has a severe impairment or combination of impairments, the Commissioner must then determine whether the impairment or combination of impairments meets or equals one of the "Listings" found in 20 C.F.R. Part 404, Subpart P, Appendix 1.   20 C.F.R. § 404.1520(a)(4)(iii).   If the claimant's impairment or combination of impairments meets or equals one of the Listings, the Commissioner will find the claimant is disabled.  *Id.* at § 404.1520(a)(4)(iii) and (d). At the third step, the ALJ determined Reese does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  (R. 30).

If the claimant's impairment or combination of impairments does not meet or equal one of the Listings, the Commissioner must determine the claimant's residual functional capacity ("RFC") before proceeding to the fourth step.  20 C.F.R. § 404.1520(e).  At the fourth step, the Commissioner will compare an assessment of the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  *Id.* at § 404.1520(a)(4)(iv) and (e).  If the claimant is capable of performing her past relevant work, the Commissioner will find the claimant is not disabled.  *Id.* at § 404.1520(a)(4)(iv).

Before proceeding to the fourth step, the ALJ concluded Reese has the RFC to perform a limited range of light work.  (R. 32).  Specifically, the ALJ determined Reese:

can never climb ladders, ropes or scaffolds.  Can frequently stoop, kneel, crouch, or crawl.  Can frequently handle and finger bilaterally. Can occasionally be exposed to extreme cold, extreme heat, and irritants such as fumes, odors, dust, and gases, poorly ventilated areas, chemicals.  Can never be exposed to workplace hazards such as moving mechanical parts and high, exposed places.  Limited to detailed but uninvolved tasks, but not at a production rate pace.  Has the ability to make simple work-related decisions and can tolerate occasional changes in the work setting.  Can tolerate occasional interaction with the public, and occasional interaction with co-workers.  Can accept instructions and respond appropriately to supervisors, where this interaction occurs occasionally throughout the workday.

(R. 32).  At the fourth step, the ALJ found Reese could perform her past relevant work as a cleaner and home attendant.  (R. 38).

The ALJ also analyzed the fifth step, at which the Commissioner must determine whether the claimant is capable of performing other work that exists in substantial numbers in the national economy in light of the claimant's RFC, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v) and (g)(1).  If the claimant is capable of performing other work, the Commissioner will find the claimant is not disabled.  *Id.*  at § 404.1520(a)(4)(v) and (g)(1).  At the fifth step, the ALJ determined there were jobs existing in significant numbers in the national economy—including mail clerk, caller, and marker—that Reese could perform.  (R. 39).  Therefore, the ALJ concluded Reese was not disabled.  (*Id.*).

## III.   Standard of Review

Review of the Commissioner's decision is limited to a determination of whether that decision is supported by substantial evidence and whether the

Commissioner applied correct legal standards. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). A district court must review the Commissioner's findings of fact with deference and may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Rather, a district court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (internal citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.* A district court must uphold factual findings supported by substantial evidence, even if the preponderance of the evidence is against those findings. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).

A district court reviews the Commissioner's legal conclusions *de novo*. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## IV.   Discussion

Reese presents a number of issues on appeal, all of which involve medical opinion evidence concerning the severity of her mental impairments and CTS.  The opinions discussing Reese's CTS were issued by Michael Tanael, MD, Gary T. Turner, MD, and Gloria L. Sellman, MD.  The opinions concerning Reese's mental impairments were issued by Jack L. Bentley, Jr., Ph.D., Virginia Lee Bare, Ph.D., Robert Estock, MD, and June Nichols, Psy.D. The ALJ addressed all of the foregoing opinions, with the exception of Dr. Nichols's, which post-dated the decision and was addressed by the Appeals Council.  The opinions are addressed below, following a recitation of the relevant law.

The SSA's 2017 regulations regarding evaluations of medical opinions[4] govern here.  For claims filed after March 27, 2017, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20 C.F.R. § 404.1520c. Instead, an ALJ must consider supportability, consistency, relationship with the claimant, length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, examining relationship specialization, and other factors in evaluating medical opinions and

---

[4] A medical opinion is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in" specific categories of work-related activities. 20 C.F.R. § 416.913(a)(2)

prior administrative medical findings. *Id.* The most important factors are supportability and consistency. *Bradford v. Soc. Sec. Admin.*, No. 7:21-CV-00129-LSC, 2022 WL 3036608, at *4 (N.D. Ala. Aug. 1, 2022) ("While the ALJ must explain the role of the supportability and consistency factors in evaluating the opinion of a medical source or administrative medical finding, he is not required to do the same for the other factors.") (footnote omitted).

As the regulations explain, the "supportability" factor focuses on the medical opinion at issue and the sources on which it relies. 20 C.F.R. § 416.920c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."). Meanwhile "consistency" focuses on the record as a whole and how it compares with the opinion at issue. 20 C.F.R. § 416.920c(c)(1) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.").

Here, Reese contends the Commissioner's analysis of the medical opinions in the record runs afoul of the governing regulations. The opinions at issue are addressed in turn.

A.     **Dr. Tanael's Consultative Examination**

Dr. Tanael conducted a physical consultative examination on May 15, 2021. (R. 690-695).  Dr. Tanael's exam revealed normal findings except for Reese's grip strength, which he rated at 4-out-of-5 bilaterally.  (R. 692; *see* R. 695).  Dr. Tanael's assessment is reproduced in its entirety below:

> Pt. with multiple medical problems including low back pain with bl radicular pain, neck pain, carpal tunnel, and depression that impair her ability to do housekeeping/laundry.  Her carpal tunnel causes severe pain that compromises grip strength bl.

(R. 695).  Elsewhere Dr. Tanael noted "Patient is unable to demonstrate normal grip strength."  (*Id.*).

The ALJ described Dr. Tanael's report before concluding it did not constitute a medical opinion under the pertinent regulations.  (R. 34-35).  Later, when determining Reese's RFC, the ALJ concluded:

> Dr. Tanael's assessment was of limited usefulness in determining the claimant's residual functional capacity and, therefore, I find it only moderately persuasive.  Although the report identifies some impairments, it is based largely on history obtained from the subjective complaints of the claimant, and not on objective data from clinical or laboratory diagnostic techniques.  Without further specificity concerning the limitations that could be attributed to the claimant's medically determined impairments, these vague statements impeded reasonable conclusions about the intensity and persistence of the claimant's symptoms, including the effects those symptoms may have on the ability to perform work-related activities.

(R. 36-37).

The ALJ's conclusion that Dr. Tanael's opinion did not constitute a medical

opinion under the regulations is correct under the *de novo* standard applicable to this legal question.  Dr. Tanael's assessment that Reese's CTS compromised her grip strength and that all of her ailments impaired her ability to do housekeeping and laundry say nothing about what Reese could still do despite her impairment.  *See* 20 C.F.R. § 416.913(a)(2).  Similarly, Dr. Tanael's vague and conclusory opinion does not shed light on Reese's abilities to perform physical, mental, and other demands of work; nor does it speak to her ability to adapt to environmental conditions.  *See id.*  Accordingly, Dr. Tanael's opinion was not a "medical opinion" under the governing regulations.

Next, while the ALJ appropriately found Dr. Tanael's assessment did not constitute a medical opinion, he did consider the report when determining Reese's RFC.  (R. 36-37).  Having already noted that reduced grip strength was the only abnormality revealed in Dr. Tanael's physical examination (R. 34-35), the ALJ reasonably noted that any other limitations Dr. Tanael alluded to were not derived from objective testing or observations (R. 36-37).  In any event, the ALJ's RFC accounts for Dr. Tanael's objective finding of moderately reduced, four-out-of-five grip strength.

For the foregoing reasons, the ALJ did not err in his assessment of Dr. Tanael's consultative examination.

**B.**    **Dr. Bentley's Consultative Examination**

Dr. Bentley conducted a consultative examination of Reese's mental status on June 1, 2021.  (R. 698-700).  After reviewing Reese's physical and psychiatric problems, Dr. Bentley reported:

> Ms. Reese reported for the examination at the scheduled time. The client supplied suitable identification to confirm her identity. There was evidence of slowing in her gross and fine motor skills.  Her appearance was moderately disheveled as she failed to wear makeup and her hair was unkempt.  She was attired and [sic] well-worn clothes. The claimant is moderately obese and exhibited some pain related behaviors.  She was moderately restless and often rubbed her back and hips throughout the interview.   The patient made fair eye contact.  She is a lower functioning adult with limited social skills.

> Her vocabulary was moderately impoverished.  There were no limitations in her receptive communication skills.   She provided relevant responses to all questions.  The patient's mood was mildly dysphoric and congruent with her affect.  There was obvious evidence of anxiety or restlessness associated with her apparent pain disorder. There were no indications of any phobias, obsessions or unusual behaviors.  The patient fatigues after minimal exertion.

> The client failed to recall any of three objects after a five-minute delay.  She indicated that there were 14 weeks in a year and was unfamiliar with the direction in which the sun rises or the author of Hamlet.   She correctly spelled the word "world."   The patient interpreted one of two Proverbs and provided the analogy in two of three simple abstractions. The patient was able to name national leaders but was unfamiliar with Alabama's governor.  She failed to subtract Serial 7's from 100 but did correctly complete a similar task utilizing 3's by  counting on her fingers.

(R. 699).  Dr. Bentley concluded Reese suffered from depressive disorder with anxiety, as well as probable, mild neurodevelopmental disorder.  (R. 699).  Bentley

ultimately opined:

> . . . [Reese] would have severe limitations in her ability to sustain complex or repetitive work-related activities. Her impairment level for simple tasks would fall in the moderate to marked range. Her limited intellectual functioning and chronic pain would significantly limit her ability to sustain most work-related activities. There are similar restrictions in her ability to communicate effectively with coworkers and supervisors.

(R. 700).

The ALJ recounted Dr. Bentley's observations before concluding his opinion was unpersuasive "because it is not consistent with or supported by the evidence that shows depression and anxiety, yet normal mental status examinations." (R. 37; *see* R. 35). The ALJ also noted Dr. Bentley's opinion was based on a one-time evaluation, and "seemed to rely heavily on the claimant's subjective complaints." (R. 37). The ALJ explained evidence gathered after Dr. Bentley's examination was more persuasive, and concluded that, while the treatment record supported some limitations, it did not support the level of limitation reflected in the opinion. (*Id.*).

As far as supportability, Dr. Bentley's opinion was based on his one-time examination. Reese contends the ALJ erred in concluding Dr. Bentley's opinion was overly reliant on her subjective complaints. (Doc. 18 at 32). Reese is correct that the portion of the mental status exam quoted above largely consists of objective observations. However, other portions of Dr. Bentley's report clearly rely on Reese's subjective statements, including: (1) descriptions of pain syndrome and

other physical symptoms; (2) descriptions of daily activities; (3) reports of past psychological symptoms; and (4) effectiveness of medication prescribed to treat her mental health problems.  (R. 698-99).  It is debatable whether these more subjective portions of the report factored heavily into Dr. Bentley's opinions, but the ALJ's affirmative conclusion in that regard is supported by substantial evidence.

Regarding consistency, the ALJ concluded the evidence gathered after Dr. Bentley's examination was more persuasive.  (R. 37).[5]  The ALJ discussed Reese's mental health treatment while assessing her RFC.  (R. 34).  While stating Reese initially saw her primary care provider for depression and anxiety—and noting mental health complaints had never caused Reese to be hospitalized or seek emergency room treatment—the bulk of the ALJ's discussion focused on treatment records from CED Mental Health ("CED"). The ALJ summarized the treatment notes and assessments generated during Reese's two CED visits in December 2021 and February 2022.  (*Id.*).

The ALJ noted the December 2021 treatment records from CED reflected Reese's complaints of low self-esteem, trouble sleeping, crying spells, hopelessness,

---

[5] In her reply brief, Reese contends the ALJ found she had only been undergoing mental health treatment since December 2021.  (Doc. 23 at 3-6).  This argument misinterprets the ALJ's summary of Reese's mental health treatment.  While the decision noted Reese "recently began treatment from a mental health professional at CED Mental Health in December 2021," the ALJ did not state this was Reese's first mental health treatment.  (R. 34).  Indeed, the next sentence of the ALJ's decision states Reese's primary care provider followed her mental health status and prescribed medication.  (*Id.*).  That statement is followed by a citation to medical records from Reese's primary care provider in 2019 and 2020.  (*Id.*) (*citing* R. 561-688).

and a desire to isolate.  (R. 34).  However, the ALJ also noted a depression screening showed minimal depressive symptoms and a mental status exam—during which Reese was relaxed and cooperative—revealed appropriate speech, fair insight, and euthymic mood, as well as normal motor activity, thought process, orientation, insight, memory, and judgment.  Reese was diagnosed with bipolar disorder, current episode depressed, with psychotic features.  (*Id.*).  Regarding the February 2021 CED visit, the ALJ recounted the treatment notes as showing no change in Reese's mental status examination and that her mood was euthymic.  While Reese continued to complain of depressive symptoms, lack of motivation, and a desire for isolation, she also stated she was doing "okay" and that her condition had improved since her first visit.  During this encounter, Reese was prescribed Aripiprazole, a medication used to treat several mental health conditions, including bipolar disorder.  (*Id.*).[6]

Reese contends the ALJ's reliance on these records constitutes cherry-picking evidence rather than considering the record as a whole.  (Doc. 18 at 33).  In support, Reese points to treatment records from Lakeside Primary Care created during three visits in May 2019, July 2019, and March 2020, as well as a treatment note from a visit in September 2018 to Floyd Primary Care Center.  (Doc. 18 at 4-5; Doc. 23 at

---

[6] It is evident the ALJ's conclusion that Dr. Bentley's opinion was inconsistent with records from subsequent mental health treatment refers to these CED visits.  The ALJ discussed these mental health records (R. 34) before recounting Dr. Bentley's mental status evaluation (R. 35) and before concluding his opinions were inconsistent with the treatment records.  (R. 37).

4-5).  During these four visits, Reese variously complained of anxiety, depression, trouble sleeping, and stress in the home.  (R. 465, 467, 563, 565, 591, 601, 603).

Reese is correct that she complained of mental health symptoms and sought treatment on the foregoing occasions.  However, the majority of her treatment notes from contemporaneous visits to Lakeside Primary Care reflect more benign symptoms and/or effectively treated mental health problems; often, Reese did not mention mental health problems.   (R. 572-576, 579-80,[7] 581-86, 595,[8] 599-600,[9]). These records, together with the treatment records from CED discussed by the ALJ, refute any assertion the ALJ scoured the record for treatment notes painting a rosier mental health picture.  In any event, the ALJ's conclusion that Dr. Bentley's opinion was inconsistent with the record as a whole is supported by substantial evidence.

For the foregoing reasons, the ALJ did not err in his assessment of Dr. Bentley's consultative examination.

### C.    Opinions from Non-Examining Agency Consultants

The record also includes the opinions of four agency consultants: Gary T. Turner, MD, Virginia Lee Bare, Ph.D., Gloria L. Sellman, MD, and Robert Estock,

---

[7] On October 1, 2019, reporting anxiety and depression was "stable" on current medication and psychiatric status was normal.

[8] On June 28, 2019, reporting normal psychiatric status.

[9] On June 12, 2019, reporting trouble sleeping, but no anxiety or depression, and improved mood; psychiatric status was normal.

MD.  Dr. Turner and Dr. Sellman offered opinions regarding Reese's CTS, while Dr. Bare and Dr. Estock evaluated Reese's mental health.

Before the agency disability determination, Dr. Turner reviewed the available medical records concerning Reese's physical problems.  (R. 118-20).  Based on these records, Dr. Tuner opined Reese was limited to unskilled work, as well as frequent fingering and grasping, due to CTS.  (R. 123, 126).  Dr. Sellman, who reviewed the medical records on reconsideration, offered very similar—if not identical—opinions regarding Reese's physical abilities.  (R. 128-38).  Specifically, Dr. Sellman opined Reese was limited to unskilled work at the medium exertional level, with only frequent handling and fingering due to CTS.  (R. 134, 137).  The ALJ's RFC incorporated or exceeded the physical limitations imposed by Dr. Turner's and Dr. Sellman's opinions.  Accordingly, a more fulsome discussion of these opinions was not required.

Regarding mental impairments, Dr. Bare reviewed Reese's available records on June 22, 2021, prior to the agency disability determination.  (R. 121-22).  Dr. Bare opined Reese suffered from moderate limitations in all four mental health functioning domains.  (R. 121).  More specifically, Dr. Bare opined Reese's mental impairments would moderately limit her ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal work schedule without interruption and at a

consistent pace; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) respond appropriately to changes in the work setting.  (R. 124-25).  Dr. Bare further opined Reese could understand, remember, and carry out simple instructions during an eight-hour day with routine breaks; she noted contact with coworkers, supervisors, and the public should be casual and nonconfrontational and that changes in the workplace should be introduced slowly.  (R. 125).

On reconsideration, Dr. Estock also reviewed Reese's available medical records—the same records reviewed by Dr. Bare.  (R. 132; *compare* R. 129 *with* R. 118).  Dr. Estock's September 27, 2021 opinion on limitations posed by Reese's mental impairments was nearly identical to Dr. Bare's, the only exception being that Dr. Estock opined Reese's ability to adapt or manage herself would be only mildly— as opposed to moderately—limited.  (R. 132).  As to Reese's abilities, Dr. Estock's opinions were also consistent with—although somewhat more detailed than—Dr. Bare's.  Specifically, Dr. Estock opined:

> A. The claimant is able to understand, remember, and carry out simple instructions but will have greater difficulty with more detailed and more complex instructions.
>
> B. The claimant is able to sustain attention and concentration for 2-hour periods at a time to complete a normal workday at an acceptable pace and schedule. CT may require regular, but not excessive work breaks during the workday. CT may be expected to miss 1 or 2 days of work

per month due to exacerbation of psychiatric symptoms.

C. The claimant is able to appropriately manage at least casual and informal contact with the general public, with co-workers, and with supervisors. Proximity to others should not be intensive or prolonged, as CT may have difficulty interacting effectively with others when taxed or stressed. CT will likely be able to accept and utilize supervision, and respond to appropriate levels of feedback and constructive instructions.

D. The claimant is able to respond to at least simple and infrequent changes in work routine.

(R. 137).

The ALJ briefly addressed Dr. Bare's and Dr. Estock's opinions together, as follows:

The agency consultants opined that the claimant has no more than moderate symptoms in the functional domains due to her mental impairments, and that she can perform a range of light work. I find their opinions to be moderately persuasive because they are generally consistent with and supported by the evidence. The analysis is adequately explained and supported with objective evidence; however, any minor discrepancies with the DDS residual functional capacity that [sic] are due to my own independent review of evidence that has been developed since the initial determination, along with evidence adduced at the hearing.

(R. 37). Reese is correct that the ALJ's combined consideration of Dr. Estock's and Dr. Bare's opinions runs counter to the regulations, which only contemplate combining consideration of all opinions from a single source. 20 C.F.R. § 416.920c(b)(1). However, that technical error does not warrant reversal here, as explained below.

18

First, it is hard to imagine how any prejudice could arise from the ALJ's combined consideration of two nearly identical opinions derived from review of the same medical records. Perhaps more importantly, the ALJ's rationale for deviating from these agency consultants' opinions—the newly-available treatment records from CED—is reasonable and is supported by substantial evidence. As explained above, those treatment records support the ALJ's conclusion regarding Reese's RFC and are inconsistent with opinions imposing more extensive limitations on Reese's abilities. For the foregoing reasons, the ALJ's assessment of the non-examining agency consultants' opinions does not warrant reversal here.[10]

### D.   The Appeals Council's Rejection of Evidence from Dr. Nichols

Following the ALJ's unfavorable decision, Dr. Nichols reviewed Reese's medical records and conducted a psychological evaluation on August 11, 2022. (R. 63-66). In addition to generating a contemporaneous report summarizing her findings, Dr. Nichols also completed a one-page form on September 15, 2022, in which she circled yes or no in response to a series of questions and filled in blanks regarding her opinions of Reese's limitations (the "Nichols Form"). (R. 62). This was among the materials Reese submitted to the Appeals Council. (R. 1). At issue here, the Appeals Council concluded the Nichols Form was not chronologically

---

[10] In light of the foregoing conclusions concerning all of the medical opinion evidence the ALJ considered, it is not necessary to address Reese's arguments that the ALJ's treatment of medical opinion evidence ran afoul of SSR 96-8p. (Doc. 18 at 35-37).

relevant because it did not relate to the period prior to the ALJ's March 28, 2022 decision. (R. 2).

Review by the Appeals Council is not guaranteed. Indeed the Appeals Council is only required to review appeals which include new, material, and chronologically relevant evidence. 20 C.F.R. § 416.1470(a). The preliminary determination whether to grant review is a legal question subject to the *de novo* standard of review in this court. *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1321 (11th Cir. 2015).

In her report, Dr. Nichols summarized Reese's mental health treatment records from 2009 through April 2022. (R. 63-64). The report also recounted Reese's statements concerning her family history and mental health symptoms. (R. 65-66). On exam, Dr. Nichols observed a number of abnormalities, including dysthymic mood, anxious affect, and thought content positive for both auditory and visual hallucinations. (R. 65). However, thought processes and conversation pace were within normal limits, and there was no evidence of confusion. (*Id.*). Nichols further observed:

> Speed of mental processing was poor. She was able to count from 20 to 1 in 17 seconds but stumbled on several numbers. She was able to spell world forward, but not backward. She was able to perform addition, subtraction, and multiplication. Memory functions appear to be grossly intact. . . . Immediate functions appear to be fair. She was able to name 3 objects but was able to name only 1 object after a 10-minute period. She could repeat 5 digits forward, but only 3 digits backward. Remote functions appear to be grossly intact. She was able

to provide a personal history in detail.

General fund of knowledge was fair.  She was able to identify the current President and past President, but could not recall the current Governor.  She reported there were 14 months in the year, did not know the number of weeks in the year, or the number of states in the United States.  Awareness of current events was poor.

Her thinking was abstract in nature.  She was unable interpret proverbs and complete two of three similar items accurately. . .  She was estimated to be functioning in the borderline range of intellectual ability.

Judgment and insight were fair.

(R. 65-66).

Dr. Nichols concluded Reese suffered from major depressive disorder, recurrent and severe with psychotic features, generalized anxiety disorder, panic disorder, specific learning disorders with impairments in reading and written expression, and borderline intellectual functioning.  (R. 66-69).  Over a month later, when she completed the Nichols Form, Dr. Nichols circled answers indicating that, while Reese could understand, remember, and carry out short, simple instructions, she was unable to: (1) maintain attention, concentration, or pace for a two-hour period; (2) perform activities on schedule and be punctual; (3) sustain an ordinary routine without special supervision; (4) adjust to routine and infrequent work changes; (5) interact with supervisors and coworkers; (6) maintain socially acceptable behavior and comply with basic standards of neatness and cleanliness. (R. 62).  Dr. Nichols also estimated Reese would be off task 30% of the time during

21

an eight-hour day and would miss over ten days out of thirty due to psychological symptoms. (*Id.*).  Dr. Nichols circled an answer indicating these impairments existed on October 27, 2020.  (*Id.*).

New evidence is chronologically relevant if it "relates to the period on or before the date of the [ALJ's] hearing decision."  *Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1309 (11th Cir. 2018).  Reese contends the Appeals Council erred in concluding the evidence from Dr. Nichols was not chronologically relevant. Reese relies on the Nichols Form, including the circled answer that Reese's limitations existed on October 27, 2020, and on the fact that Dr. Nichols's opinion was partially based on review of medical records reflecting mental health treatment prior to the ALJ's decision.  (Doc. 18 at 42).  The Eleventh Circuit has found a psychologist's post-decision findings chronologically relevant where: (1) the claimant described mental symptoms during the relevant period to the psychologist, (2) the psychologist had reviewed the claimant's mental health treatment records from that period, and (3) there was no evidence of the claimant's mental decline since the ALJ's decision.  *Washington*, 806 F.3d at 1321.

The problem for Reese is that, even if Dr. Nichols's opinion were chronologically relevant, it is not material.  As an initial matter, Reese contends this court's review is limited to the question of chronological relevance—the only explicit reason the Appeals Council offered to justify denying review.  (Doc. 18 at

43-44).   As Reese would have it, deciding this question on any basis other than chronological relevance would constitute a *post hoc* rationalization.  (*Id.*).  The court disagrees. *See Washington*, 806 F.3d at 1321-22 (considering materiality of new evidence where Appeals Council denied review as chronologically irrelevant); *Chapman v. Comm'r of Soc. Sec.*, No. 22-13863, 2023 WL 8441514, at *2 (11th Cir. Dec. 5, 2023) ("As part of our *de novo* review, we may consider factors that the Appeals Council did not when it initially refused to consider new evidence.").

Evidence is material if "there is a reasonable possibility that the new evidence would change the administrative outcome." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987).   Here, the questions of materiality and chronological relevance are somewhat intertwined.   To the extent Dr. Nichols's opinion was based on pre-decision treatment records—and thus could be chronologically relevant—these are the same treatment records the ALJ determined were inconsistent with the other medical opinions concerning Reese's mental impairments.  As explained above, the longitudinal treatment record is inconsistent with the greater level of impairment Dr. Nichols assigned to Reese.  Accordingly, there is not a reasonable possibility that Dr. Nichols's opinion would change the administrative result.  In other words, to the extent the opinion could be chronologically relevant, it is immaterial.  And to the extent Dr. Nichols based her opinion on the August 11, 2022 evaluation of Reese— more than four months after the ALJ's decision—it is chronologically irrelevant.

For the foregoing reasons, the Appeals Council's treatment of Dr. Nichols's opinion is not grounds for reversal here.

## V.      Conclusion

Having reviewed the administrative record and considered all the arguments presented by the parties, the court finds the Commissioner's decision, which is supported by substantial evidence and is in accord with applicable law, is due to be affirmed.  A separate order will be entered.

**DONE** this 18th day of September, 2024.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE